IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMERISOURCEBERGEN DRUG CORP.,** : | | **CIVIL ACTION** |
| Plaintiff and : | | |
| Counter-Defendant, : | | |
| : | | |
| v. : | | |
| : | | |
| **KOHLL'S PHARMACY & HOMECARE,** : | | |
| **INC.,** : | | **NO. 09-1166** |
| Defendant and : | | |
| Counter-Claimant. : | | |

**M E M O R A N D U M**

**GENE E.K. PRATTER, J.**                                                                                              **OCTOBER ____, 2012**

Amerisourcebergen Drug Corporation ("ABDC") has sued Kohll's Pharmacy and Homecare, Inc. ("Kohll's") for breach of contract. The parties have filed cross-motions for partial summary judgment. Kohll's asks the Court to rule as a matter of law that a mutual or unilateral mistake occurred during the formation of its contract with ABDC, while ABDC argues that Kohll's breached the contract. For the following reasons, the Court denies both motions.

# I.  Factual Background[1]

ABDC is a wholesale distributor of pharmaceutical products, while Kohll's is a retail pharmacy with an annual sales volume of $33 million. On December 27, 2005, Kohll's president, David Kohll, signed an Individual Purchase Agreement ("IPA"), which set forth terms and conditions regarding a business relationship between it and ABDC. The parties dispute the significance of this document, as ABDC contends that the IPA is merely a negotiation document, not a contract. Language in the IPA stated that "[e]ach party reserves the right to terminate this agreement with 60 days notice."

---

[1] The parties agree that these facts are undisputed unless otherwise noted.

1

On January 23, 2006, ABDC and Kohll's executed a Prime Vendor Agreement ("PVA"). Under the PVA, ABDC agreed to provide products, including prescription and over-the-counter pharmaceuticals, to Kohll's. The parties agree that either party could terminate the PVA "for cause," but that the PVA did not allow Kohll's to terminate the agreement upon receipt of a more favorable offer from an ABDC competitor. The PVA established that the "term of agreement" would run from January 23, 2006 until January 31, 2012, and (unlike the IPA) it did not include language allowing either party to terminate the agreement upon 60 days of notice prior to January 31, 2012.[2] The PVA also stated that "[i]n the event of a conflict between a prior document between the parties and this Agreement, this Agreement will control. This Agreement supersedes prior oral or written representations by the parties that relate to its subject matter other than the security interest[.]"

Critically, the PVA included a section entitled "Minimum Order Volume," which stated that:

> Customer's minimum annual Net Purchase (total purchases less returns, credits, rebates, late payment fees and similar items) volume during Year 1 is $15,600,000. Year 1 is from the Effective Date to January 31, 2007. Subsequent contract years are the following twelve (12) month periods. Customer's Net Purchases during subsequent years are projected to increase at a rate of 5.00% per year during each year of the Term. Customer's aggregate Net Purchase volume over the life of this Agreement will be no less than $106,089,000.

As discussed below, ABDC argues that this quoted language entitles it to partial summary judgment.

On January 6, 2009, Kohll's informed ABDC that it intended to terminate the PVA. Although ABDC's counsel objected to the termination, Kohll's ceased purchasing products from

---

[2] The PVA did include language that allowed ABDC to terminate it upon 60 days written notice.

ABDC after January 2009.  The parties agree that Kohll's did not terminate the PVA "for cause." On February 19, 2009, ABDC filed this action and alleged that Kohll's breached the PVA.

## II.  Standard of Review

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.* (citing *Anderson*, 477 U.S. at 248).  Under Rule 56, the Court must view the evidence presented in the motion in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255.  However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment."  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for its motion for summary judgment and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III. Kohll's Motion for Partial Summary Judgment

*A. Mutual Mistake*

In its motion for partial summary judgment, Kohll's contends that either a mutual or unilateral mistake occurred during the formation of the PVA and that, given this mistake, the Court should reform the PVA to include a provision allowing either party to terminate the contract after giving the other side 60 days of notice. Under Pennsylvania law,[3] courts may reform a contract due to the mutual mistake of the parties. *See Vonada v. Long*, 852 A.2d 331, 337 (Pa. Super. Ct. 2004). However, a mutual mistake only exists if "'both parties to a contract [are] mistaken as to existing facts at the time of execution. Moreover, to obtain reformation of a contract because of mutual mistake, the moving party is required to show the existence of the mutual mistake by evidence that is clear, precise and convincing.'" *See id.* (quoting *Smith v. Thomas Jefferson Univ. Hosp.*, 621 A.2d 1030, 1032 (Pa. Super. Ct. 1993)). A court may consider parol evidence to determine the existence of a mutual mistake. *See Wells Fargo Home Mortg. v. Leach*, No. 10-449, 2010 U.S. Dist. LEXIS 77234, at *10 (W.D. Pa. July 30, 2010) (citing *Bugen v. N.Y. Life Ins. Co.*, 184 A.2d 499, 501 (Pa. 1962)).

The Court finds that Kohll's has not shown by "clear, precise and convincing" evidence that both ABDC and Kohll's mistakenly failed to include a 60-day termination provision in the

---

[3] The parties agree that Pennsylvania law governs the issues presented in their motions.

4

PVA. *Vonada*, 852 A.2d at 337. On the contrary, Greg Arnold, a director of sales at ABDC who negotiated the PVA with David Kohll in January 2006, has testified that he never would have offered Kohll's such a termination provision. Moreover, Dennis Witkowski, a business development manager at ABDC who discussed the IPA with David Kohll in December 2005, has testified that the IPA was a negotiation document rather than an actual contract. Given this evidence, a factfinder could reasonably conclude that ABDC did not mistakenly omit the 60-day termination provision in the IPA from the terms of the PVA, because it never intended such a provision to become part of the PVA. *See Leach*, 2010 U.S. Dist. LEXIS at *8 ("[T]he movant must clearly show the actual intent of the parties at the time the instrument was executed.") (citing *Hassler v. Mummert*, 364 A.2d 402, 403 (Pa. Super. Ct. 1976)).[4]

## B. Unilateral Mistake

Kohll's alternatively argues that it should prevail because David Kohll made a unilateral mistake and signed the PVA believing that it contained the 60-day termination provision. A party seeking to reform a contract due to a unilateral mistake "must show, by clear and convincing evidence, that the party against whom reformation is sought had such knowledge of the mistake as to justify an inference of fraud or bad faith." *Regions Mortg., Inc. v. Muthler*, 844 A.2d 580, 582 (Pa. Super. Ct. 2004); *see also McFadden v. Am. Oil Co.*, 257 A.2d 283, 289 (Pa. Super. 1969) ("[W]hen there is mistake on one side and fraud on the other, relief is available. Likewise, irrespective of active fraud, if the other party knows or has good reason to know of the unilateral mistake, relief will be granted to the same extent as a mutual mistake.") (citations omitted).

---

[4] The parties agree that the terms of documents like the IPA are preapproved within ABDC before being presented to customers. However, given ABDC's evidence that it distinguishes IPA-type documents from legal contracts, the inclusion of a 60-day termination provision in the IPA does *not* necessarily indicate that ABDC intended such a provision to become part of the PVA.

Here, Kohll's fails to show that a reasonable factfinder would necessarily conclude that ABDC knew or should have known that Kohll's believed the PVA contained a 60-day termination provision. ABDC has presented evidence that Kohll's extensively negotiated the terms of the PVA in January 2009. Additionally, Greg Arnold has testified that he believed David Kohll was a "very smart" and "very tough" businessman who would have personally read the PVA before signing it. Based on these facts, a factfinder could conclude that ABDC possessed a good-faith belief that Kohll's knew the terms of the PVA, including its non-inclusion of a 60-day termination provision, and that ABDC thus lacked "such knowledge of [Kohll's] mistake as to justify an inference of fraud or bad faith." *Muthler*, 844 A.2d at 582.[5]

## IV.  ABDC's Motion for Partial Summary Judgment

ABDC moves for summary judgment regarding Kohll's liability based on the following language in the PVA:

> [Kohll's] minimum annual Net Purchase (total purchases less returns, credits, rebates, late payment fees and similar items) volume during Year 1 is $15,600,000. Year 1 is from the Effective Date to January 31, 2007. Subsequent contract years are the following twelve (12) month periods. [Kohll's] Net Purchases during subsequent years are projected to increase at a rate of 5.00% per year during each year of the Term. [Kohll's] aggregate Net Purchase volume over the life of this Agreement will be no less than $106,089,000.

ABDC's straightforward argument is that even if a factfinder concluded that a mutual or unilateral mistake caused the parties to omit the 60-day termination provision from the PVA, the PVA nonetheless required Kohll's to purchase $106 million in product from ABDC.[6]

---

[5] At his deposition, David Kohll disputed the characterization that he extensively negotiated the PVA in January 2006. The Court notes that the parties' factual dispute over whether the PVA was extensively negotiated helps to demonstrate why resolving Kohll's affirmative defense of mistake is inappropriate at this stage of the litigation.

[6] The parties agree that Kohll's only purchased about $50 million in product from ABDC before terminating the PVA.

Under Pennsylvania law, "[t]he fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (citing *Felte v. White*, 302 A.2d 347, 351 (Pa. 1973)). In interpreting a contract, "[t]he whole instrument must be taken together in arriving at contractual intent." *Id.* (citing *Felte*, 302 A.2d at 351). Although courts interpret unambiguous contracts as a matter of law, "ambiguous writings are interpreted by the finder of fact." *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) (citing *Cmty. Coll. v. Soc'y of the Faculty*, 375 A.2d 1267, 1275 (Pa. 1977)). A latent ambiguity in a contract "'arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'" *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (internal quotation omitted) (discussing Pennsylvania law).

In *Ellwood*, two companies formed a joint venture to produce steel ingots. *See id.* at 85-87. The parties' contract stated that, under certain circumstances, the defendant could receive rebates on all the ingots it purchased from the joint venture, regardless of whether it subsequently sold those ingots to a third party. *See id.* at 96-97. The defendant argued that this contractual language was unambiguous. *See id.* However, the plaintiff responded that, based on other provisions of the contract as well as extrinsic evidence, the contract contained a latent ambiguity and did not allow the defendant to receive rebates on ingots it resold to third parties. *See id.* at 97.

The Third Circuit Court of Appeals held that the contract was ambiguous and that a factfinder should interpret it. *Id.* at 100. The court noted that while "mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous," *id.* at

94, a party may nonetheless show that a seemingly clear contractual term contains a latent ambiguity. To make such a finding, the party must first identify other portions of the contract which support a "reasonable alternative interpretation" of a seemingly clear term and "narrow[] the plain meaning" of that term without flatly contradicting it. *Id.* at 100. Once a party clears this hurdle, it may then rely on extrinsic evidence, including the testimony of its employees, to establish the existence of a latent ambiguity. *See id.* at 98-100. Because the plaintiff satisfied both of these requirements, the Third Circuit Court of Appeals found that the district court correctly held that the "decision as to which of the competing interpretations of the contract is the correct one [should be] reserved for the factfinder." *Id.* at 94.

In this case, the PVA signed by ABDC and Kohll's clearly stated that Kohll's "aggregate Net Purchase volume over the life of this Agreement will be no less than $106,089,000." ABDC argues that this language is unambiguous. However, other contractual language indicates an alternative reading of the PVA: the "aggregate Net Purchase volume over the life of this Agreement will be no less than $106,089,000 *if the Agreement is not terminated before the end of its six-year term*." Specifically, Clause 7 of the PVA establishes that the parties will only have to pay a penalty for an early termination of the contract if the termination occurs prior to January 31, 2009. This language arguably indicates that the parties did *not* intend to penalize each other if a termination occurred after three years, regardless of whether Kohll's had purchased $106 million in product from ABDC.

Moreover, the language immediately preceding the PVA's $106-million purchase requirement obligated Kohll's to purchase $15.6 million of product during the first year of the contract and stated that purchases during the subsequent five years "are projected to increase at a rate of 5.00% per year." The parties agree that if Kohll's had purchased $15.6 million in the first

8

year of the contract and its purchases increased by five percent per annum thereafter, it would have ended up buying $106 million in product from ABDC. The parties' choice to include language about projected five-percent increases thus may evidence their intent to establish purchase requirements that took effect on an annual basis, and to only require Kohll's to purchase $106 million if the PVA remained in effect for the full six years.

In interpreting the PVA, the Court cannot "ignor[e] all but one sentence in the [c]ontract." *Murphy*, 777 A.2d at 432. Instead, the Court must "look to the contract as a whole for guidance in interpreting a term in the contract." *Ellwood*, 247 F.3d at 97. Given the language discussed above, the Court finds that the totality of the PVA indicates that a reasonable alternative interpretation of the $106-million requirement may exist. Under this alternative reading, Kohll's only had to purchase $106 million in product if the contract remained in effect for six years. Such a reading finds support in the language of the PVA itself and would permissibly "narrow[] the plain meaning" of the $106-million requirement without flatly contradicting it. *Id.* at 100. Because additional language in the PVA "serves to cast doubt on [ABDC's] claim that the [PVA] is unambiguous," the Court must "examine the extrinsic evidence that [Kohll's] offers to support [an] alternative interpretation" of the $106-million requirement. *Id.* at 98.

The extrinsic evidence before the Court on this issue includes the deposition testimony of David Kohll, who has testified that Dennis Witkowski told him during negotiations that "after three years [Kohll's] would not have to pay *any money at all*" if it terminated the PVA. Mr. Kohll also stated that Mr. Witkowski promised that "everything is the same" between the IPA and PVA because the latter agreement's penalties were limited to the first three years of the contract. Furthermore, Mr. Kohll testified that he told Mr. Witkowski that Kohll's intended to

9

put the PVA out for a request for proposal after the third year of the contract.  These statements collectively indicate that the parties intended to allow Kohll's to terminate the PVA without penalty after three years, regardless of whether it already had purchased $106 million in product. Therefore, the other provisions of the PVA and the extrinsic evidence proffered by Kohll's lead the Court to conclude that the PVA "contained latently ambiguous language" with respect to the $106 million purchase requirement, and that the "the proper interpretation of the [$106 million requirement is] an issue for the jury to decide." *Ellwood*, 247 F.3d at 100.[7]

Additionally, Kohll's argues that the Court cannot summarily adjudicate its liability at this stage because a factfinder could determine that a mutual or unilateral mistake occurred in omitting the 60-day termination provision from the PVA.  In response, ABDC argues that the PVA requires Kohll's to purchase $106 million in product even if Kohll's could terminate the contract upon 60 days of notice.

The Third Circuit Court of Appeals has held that "if the plain meaning of a contract term would lead to an interpretation that is absurd and unreasonable, Pennsylvania contract law allows a court to construe the contract otherwise in order to reach 'the only sensible and reasonable interpretation' of the contract." *Ellwood*, 247 F.3d at 96 (quoting *United Refining Co. v. Jenkins*, 189 A.2d 574, 580 (Pa. 1963)).  By seeking summary judgment before a factfinder has determined whether a mutual or unilateral mistake occurred, ABDC asks the Court to interpret the PVA so that Kohll's would have to purchase $106 million in product – an amount that exceeds Kohll's annual sales volume by more than 300%– even if the contract only remained in

---

[7] ABDC argues that an alternative reading of the $106 million requirement would treat that requirement as "surplusage" and make it "wholly unnecessary and entirely meaningless." *Benchmark Grp., Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562, 579 (E.D. Pa. 2009).  The Court disagrees, as the alternative interpretation would require Kohll's to purchase $106 million of product if the PVA remained in effect for six years, and thus does not render the $106 million requirement "entirely meaningless."

effect for 61 days.  The Court finds that "such an interpretation of the [PVA] would be 'absurd and unreasonable' . . . [and] will not interpret the [PVA] in this manner." *Ellwood*, 247 F.3d at 110 (quoting *Jenkins*, 189 A.2d at 580).  Therefore, even if the PVA did not contain a latent ambiguity, the Court would not interpret it to require Kohll's to purchase $106 million of product as a matter of law.

## V.  Conclusion

For the foregoing reasons, the Court denies the parties' motions for partial summary judgment.  An Order consistent with this Memorandum follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge